UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EQUAL EMPLOYMENT OPPORTUNITY       §
COMMISSION,                        §
                                   §
            Plaintiff,             §
                                   §
vs.                                §       CIVIL ACTION NO. H-05-2945
                                   §
EGS ELECTRICAL GROUP, L.L.C.,      §
            Defendant.             §

## MEMORANDUM AND ORDER

This employment discrimination case is before the court on defendant EGS Electrical

Group L.L.C.'s (EGS's) motion for summary judgment.  Having considered the parties'

submissions, all matters of record, and applicable law, the court concludes that EGS's motion

should be denied.

I.    **Background**

The Equal Employment Opportunity Commission (EEOC) has brought this Equal Pay

Act and Title VII case on behalf of two female EGS employees, April Harrison[1] and Karen

Barfield.  Harrison and Barfield complain that they have been, and continue to be, paid less

than a male coworker, Glenn Anthony (Tony) Johnson, who performs the same job.  Harrison

---

[1]      April Harrison recently married Tony Johnson and changed her name to April Johnson.  The
court will refer to her as Harrison, the name under which she filed her charge.

also asserts that EGS transferred her to a less desirable job in retaliation for filing a complaint with the EEOC.[2]

EGS manufactures and sells electrical products such as switch racks, explosion proof enclosures and controls, instrumentation boxes, and control centers. EGS manufactures and sells these products under the brand names Appleton, OZ/Gedney, Curlee, and Nelson. The EGS Houston facility is known as Enclosures and Controls (E&C).

EGS hired Barfield as an order entry clerk in 1993. In 1997, she began working in the E&C inside sales group at a salary of $23,520. EGS hired Harrison in 1997. She was promoted to a position in E&C inside sales in 1999, at a salary of $22,175. EGS hired Johnson for an E&C inside sales position in 1999, at a starting salary of $37,000. Beginning in 1999 and until late October 2004, Harrison, Barfield, and Johnson worked together in E&C inside sales in what is known as Building A, or the North Building, of EGS's Houston facility. The inside sales job requires comprehensive product knowledge in order to customize products and options to meet customer specifications. At times, the completion of a sales quote requires working with engineers to create drawings of the application. Also at times, the job requires creation of drill and tap charts illustrating the position of holes to be drilled on an enclosure. The job requires regular communication and coordination with the engineering, purchasing and planning, and manufacturing departments as well as the

---

[2]     Barfield filed her charge of discrimination with the EEOC on October 4, 2004. Harrison followed on October 25, 2004. On January 10, 2005, Harrison amended her EEOC charge to add a retaliation claim.

2

outside sales group.  Beginning in 2003, each member of the inside sales group was assigned a sales territory.  When a customer called in, the person responsible for the customer's territory would handle the call.  Computer records indicate that Harrison, Barfield, and Johnson were responsible for approximately equal sales revenue.  Barfield and Johnson continue to work in inside sales.

In late October 2004, Harrison was transferred from the inside sales group in Building A to a position in Building C, or the South Building.  Her job still involves inside sales for Appleton-brand products, but she is no longer responsible for her sales territory and no longer provides quotes for customized applications.  Her job primarily consists of handling customer service inquiries regarding standard catalog products.

The grade and salary history[3] for Harrison, Barfield, and Johnson is illustrated in the following chart:

| Date | Barfield grade/salary | Harrison grade/salary | Johnson grade/salary |
|---|---|---|---|
| April 1999 | | 28/$22,175 | |
| June 1999 | 28/$31,200 | | 30/$37,000 |
| Dec. 1999 | | 28/$25,501 | |
| April 2000 | | 28/$28,630 | |
| July 2000 | 28/$32,136 | | |
| Jan. 2001 | | | 30/$38,000 |

---

[3]   Each position at EGS is designated by grade.  Each grade has a corresponding minimum, competitive, and maximum salary range.

3

| | | | |
|---|---|---|---|
| Oct. 2001 | | | 32/$42,000 |
| Oct. 2002 | | 28/$33,750 | |
| Dec. 2002 | 28/$33,048 | | |
| April 2003 | | | 32/$43,000 |
| Dec. 2003 | 28/$33,876 | 28/$34,599 | |
| April 2004 | | | 32/$50,000 |
| Sept. 2004 | 30/$35,570 | 30/$36,330 | |
| Nov. 2004 | 30/$44,000 | 30/$44,000 | |
| May 2005 | | | 32/$51,000 |
| July 2005 | 30/$45,320 | | |
| Oct. 2005 | | 30/$45,320 | |
| 2006 | 30/$46,680 | 30/$46,226 | 32/$53,000 |

It is undisputed that Barfield and Harrison are, and have always been, paid significantly less than Johnson.[4] EGS also does not contest, for summary judgment purposes, that Barfield and Harrison performed essentially the same job as Johnson.[5]  However, EGS asserts that the pay disparity is based on factors other than gender.

**II.**   **Legal Standards**

   **A.**   **Summary Judgment**

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The party

---

[4]      EGS motion, at 10.

[5]      *Id.* at n.2.

4

moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party. *In re Segerstrom*, 247 F.3d 218, 223 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d 303, 310 (5th Cir. 2002).

If the movant meets this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995)). If the evidence presented to rebut the summary judgment is not significantly probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). In determining whether a genuine issue of material fact exists, the court views the evidence and draws inferences in the light most favorable to the nonmoving party. *Id.* at 255.

### B.   <u>Equal Pay Act</u>

In order to prevail on a claim brought under the Equal Pay Act (EPA), the plaintiff bears the burden of establishing that:

(1)   the employer is subject to the EPA;

(2)     the employee performed work in a position requiring equal skill, effort, and responsibility under similar working conditions as an employee of the opposite sex; and

(3)     the employee was paid less than the employee of the opposite sex providing the basis of comparison.

*See* 29 U.S.C. § 206(d)(1); *Chance v. Rice University*, 984 F.2d 151, 153 (5th Cir. 1993). "Unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a *prima facie* case under the Equal Pay Act." *Id.* at 1153.

Under the EPA, the employer bears the burden of proof on an affirmative defense that the difference in wages is justified by one of four exceptions contained in the EPA.  *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974); *Peters*, 818 F.2d at 1153.  The exception that EGS claims applies here is that the wage differential is "based on any other factor other than sex."  29 U.S.C. § 206(d)(1)(iv).[6]

Assessing the probative value of the parties' competing evidence in EPA cases often requires credibility determinations and detailed factual development, which render these issues inappropriate for disposition through summary judgment. *See Brobst v. Columbs Serv.*

---

[6]     The other three exceptions are for disparate payments "made pursuant to (i) a seniority system; (ii) a merit system; [and] (iii) a system which measures earnings by quantity or quality of production."  29 U.S.C. § 206(d)(1).

*Int'l*, 761 F.2d 148, 156 (3d Cir. 1985) ("given the fact intensive nature of the inquiry, summary judgment will often be inappropriate").

### C.    Title VII

A claim of salary discrimination under Title VII closely resembles, but is not identical to, an EPA claim. *See Uviedo v. Steves Sash & Door Co.*, 738 F.2d 1425, 1431 (5th Cir. 1984) ("To establish a *prima facie* case of discrimination respecting compensation a plaintiff must prove (1) that she is a member of a protected class, and (2) that she is paid less than a nonmember for work requiring substantially the same responsibility."). Title VII incorporates the same defenses available under the EPA. 42 U.S.C. § 2000e-2(h). However, in contrast to the EPA, ultimately it is the plaintiff's burden under Title VII to prove that unequal treatment is the result of intentional discrimination. *Celestine v. Petroles de Venezuella SA*, 266 F.3d 343, 355 (5th Cir. 2001).

In addition to the discriminatory pay claim, the EEOC asserts a Title VII retaliation claim on behalf of Harrison. The Supreme Court recently established standards for a Title VII retaliation claim in *Burlington Northern & Santa Fe Rwy Co. v. White*, 126 S. Ct. 2405 (2006). In order to establish a claim of retaliation, a plaintiff must show (1) she engaged in protected activity; (2) she was subjected to an action that a reasonable employee would find materially adverse; and (3) a causal link exists between the protected activity and the adverse action. *Id.*

A materially adverse action for purposes of retaliation need not be an ultimate employment decision as required for proof of a claim under Title VII's substantive provision. *Burlington Northern Ry.*, 126 S. Ct. at 2414. An action is materially adverse for purposes of Title VII's retaliation provision if it "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 2415 (internal citation omitted). Whether or not an action will meet this standard will often depend on the particular circumstances. *Id.* Moreover, a plaintiff need not show that the protected activity was the sole motivating factor for the adverse action, but only that it was a motivating factor. *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001).

## III.   Analysis

### A.   Wage Disparity Claims

The EEOC has presented uncontradicted evidence that Barfield and Harrison were paid less than Johnson for essentially the same job. EGS argues that it paid Johnson more based on (1) his education and experience; (2) his negotiated starting salary; and (3) EGS's decision to match two outside job offers. Under the EPA, EGS must do more than merely articulate gender-neutral factors, it must "prove that the pay differential was based on a factor other than sex." *Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 579 (8th Cir. 2006).

There is a factual dispute as to whether Johnson's education and experience, starting salary, or outside offers justify a pay disparity in this case. The EEOC has presented some evidence that EGS did not actually rely on Johnson's education and training in deciding his

salary.  The 1999 memorandum recommending Johnson's employment notes his general technical ability and solid work history, but does not refer to his education or industry training as reasons for hiring him.[7]  Jeff Philippe, the operations manager at EGS who was responsible for Johnson's performance evaluations and recommended him for raises, knew very little about Johnson's education and nothing of his industry-related training.[8]  Johnson testified that he has zero college credits, and his transcript from Kilgore College indicates that he failed every course he took in the Spring of 1988.[9]  Barfield graduated from high school, and Harrison earned a GED.[10]  Thus, the three employees have essentially equivalent educational backgrounds.

Furthermore, education and training that are not necessary to perform the job at issue do not justify a wage difference.  29 C.F.R. § 800.125; *Simpson*, 441 F.3d at 578-79. Philippe, who supervised the three inside sales employees on a daily basis beginning in 2003, testified that Johnson does not utilize his prior education and training in the performance of the inside sales job.[11]  In addition, Johnson testified that none of the industry training he possesses gives him an advantage because it was necessary to "learn [the job] as you go."

---

[7]     EGS 410, Exhibit O to plaintiff's response.

[8]     Philippe Dep. at 49-50.

[9]     Johnson Dep., Exhibit F to plaintiff's response, at 43-44; Transcript, Exhibit Q to plaintiff's response.

[10]    Barfield Aff., Exhibit A to plaintiff's response, ¶ 6; Harrison Aff., Exhibit B to plaintiff's response, ¶ 2.

[11]    Philippe Dep., Exhibit H to plaintiff's response, at 33-35, 50.

Johnson relied heavily on Barfield and Harrison for on the job training.[12]  In fact, at the time Johnson was hired, Barfield had been successfully performing the E&C inside sales job for approximately two years, while Johnson's prior experience was not with a manufacturer and did not involve enclosures and controls for use in hazardous locations.[13]  A September 12, 2002 salary change form for April Harrison states that she is currently earning less that other employees in the same position *with less experience*, an apparent reference to Johnson.[14]

EGS also relies on Johnson's negotiated starting salary in defense of his consistently higher salary.  Even if this explains the salary disparity in 1999, it is not an explanation for EGS's failure over the next several years to equalize the pay of its employees who were performing the same job at comparable levels of efficiency.[15]  There is also some evidence to suggest that Johnson's starting salary was not the product of any real negotiation.[16]

Finally, EGS contends that the pay disparity is a result of two outside job offers Johnson used as leverage to secure raises.  However, when Barfield and Harrison asked

---

[12]     Johnson Dep., at 101, 122, 243.

[13]     Johnson Dep., at 62-63.

[14]     EGS 326, Exhibit O to plaintiff's response (emphasis added).

[15]     EGS 1305-26, Exhibit O to plaintiff's response (showing that in 2004, Barfield was responsible for $4,717,723.65 worth of business, Harrison $4,514,805.25, and Johnson $3,778,240.72).  Philippe testified that he considered Barfield the most successful employee of the three.  Philippe Dep., at 52-54.

[16]     Johnson Dep., at 133, 138, 276-77 (stating that he wrote a desired salary range on his application, but he had no conversations with anyone at EGS about what salary he would accept).

whether they could get raises if they had matching outside job offers, they were told EGS does not "play that game," or "operate that way."[17]  Yet, EGS did play that game with Johnson,[18] and in fact relies on those offers to justify Johnson's higher salary.  At the time he sought approval for Johnson's 2004 raise based on an outside job offer, Philippe pulled the files to compare Barfield and Harrison's compensation rates.  He realized then that the raise created a problem because they were doing the same job as Johnson for less pay.  Philippe told Jerry McQuade, Vice President of Human Resources for EGS, that the disparity needed to be fixed.[19]  The fact that Johnson's salary reflects his market value only highlights the fact that EGS  paid Barfield and Harrison well below market levels.  This evidence creates a fact issue as to whether Johnson's outside job offers are factors other than sex that in fact justify the pay differential.  The court concludes that EGS has not met its burden to prove its EPA defenses as a matter of law, and the EEOC has met its burden to show a material fact dispute as to whether the pay disparity was the result of discrimination.  Therefore, EGS's motion for summary on the EPA and Title VII salary disparity claims must be denied.

### B.    Title VII Retaliation

---

[17]    Barfield Aff., ¶ 45; Harrison Aff., ¶ 37.

[18]    There is some evidence that EGS also did it for another male employee, Cris Janin.  Harrison ¶ 37; Harrison Dep., at 183-85.

[19]    Philippe Dep. at 90-95; EGS 568, Exhibit O to plaintiff's response.

As to Harrison's retaliation claim, EGS argues that (1) her transfer is not materially adverse; and (2) the transfer decision was made before Harrison filed her EEOC charge, eliminating any causal link between her protected activity and the transfer. Again, fact questions on these issues preclude summary judgment.

Immediately after filing her charge, Harrison was moved to a position in another building, with non-EGS employees. The majority of her inside sales duties were eliminated, and she was relieved of responsibility for her sales territory. Her physical location makes it difficult for her to handle the ATX sales duties she is assigned. The products she sells are standard catalog products and do not require engineering.[20] EGS managers characterize her new position as primarily a customer service position.[21] Significantly, there is evidence that other E&C employees perceived Harrison's move as punishment for her filing an EEOC charge.[22] The court concludes there is sufficient evidence to create a fact question as to whether a reasonable employee would consider what happened to Harrison to be materially adverse.

Fact questions also exist as to when Harrison first engaged in a protected activity, and when management decided to transfer Harrison to another position. It is clear that Harrison

---

[20] Harrison Aff., ¶¶42-46, 56.

[21] Dreher Dep., Exhibit G to plaintiff's response, at 61-66, 184-85; Morris Dep., Exhibit J to plaintiff's response, at 23-25.

[22] Vann Dep., at 174 ("It looked . . . to everybody in the company, that it was a way to punish her, because all this happened after she filed the suit. Once they found out about it, . . . April was being treated like a third-class citizen.").

engaged in protected activity when she filed her EEOC charge on October 25, 2004.  It is also clear that Harrison complained about her salary prior to filing her charge.  However, EGS contends that prior to filing her EEOC charge, Harrison never complained that her salary was the product of gender discrimination.  An employee who does not identify gender, or other illegal basis under Title VII, as the basis for her treatment does not engage in a protected activity.  *Harris-Childs v. Medco Health Solutions, Inc.*, 169 Fed. Appx. 913, 916 (5th Cir. 2006).

On August 18, 2004, Philippe sent an e-mail to McQuade stating "[t]he ladies remind me at least every other day that they are doing the same work for substantial differences in pay."[23]  Shortly thereafter, Philippe sent a September 9, 2004 e-mail to Peterson  stating that it was "wrong" that the company was paying the women less than a male co-worker, and that Philippe had notified McQuade of the problem in July.[24]  Thus, there is some evidence to contradict EGS's position  that Harrison did not make it clear that her dissatisfaction with her salary was related to an allegation of gender bias before she filed her EEOC charge.  There is some evidence she had made it clear to Philippe as early as July, 2004.

The next issue, then, is whether EGS decided to change Harrison's job before she engaged in any protected activity.[25]  EGS contends that the decision to transfer Harrison was

---

[23]     EEOC 334, Exhibit O to plaintiff's response.

[24]     EGS 329, Exhibit O to plaintiff's response.

[25]     There is some confusion about when Harrison learned her job duties would  change.
(continued...)

made early in 2004 as part of its "Gulf Coast Initiative" to focus on marketing Appleton products to Gulf Coast refinery customers. But Philippe, who took part in meetings during which the Gulf Coast Initiative was discussed, testified that it was not part of the business plan in 2004 to transfer Harrison. In fact, paperwork had just been submitted on October 1, 2004 to move Harrison to the E&C payroll along with Barfield and Johnson.[26] An October 21, 2004 e-mail from John Peterson to Jerry McQuade reflects that a change was in the works for Harrison at that time, but it does not indicate when that plan was first conceived.[27] There is also some question as to whether that October 21 e-mail reflects the actual move that was implemented on October 27, 2004. While the e-mail indicates that Harrison will be responsible for Appleton quotations while another employee is out on maternity leave, it does not indicate that the move would be permanent. The e-mail also indicates that Harrison will

---

[25]     (...continued)
Harrison's October 25, 2004 EEOC charge states that she discovered on October 22, 2004 that she was being "demoted" to a customer service position. Exhibit P to plaintiff's response. Harrison's affidavit says she learned about her permanent transfer for the first time on October 27, 2004, when she arrived at work to find a maintenance worker packing the contents of her desk. Harrison Aff., ¶ 39. There is no evidence she was aware before October 27, 2004 that the physical location of her work space would change.

[26]     Philippe Dep., at 124-129; EGS 568, Exhibit O to plaintiff's response. Apparently, EGS had neglected to move Harrison to the E&C payroll after she was promoted into inside sales in 1999. Harrison was moved back to the Appleton income statement in February 2005 and her title was changed from Product Support Specialist II to ATX & Appleton Inside Sales/Quotations Correspondent. EGS 340, Exhibit O to plaintiff's response.

[27]     EEOC 1011, Exhibit O to plaintiff's response.

14

"assist Ray Malek (RDC Mgr) as the order entry and systems guru on the LogPro conversion," an assignment it appears she was never given.[28]

The conflicting evidence about when Harrison first engaged in protected activity and when EGS decided to transfer her prevent entry of summary judgment in EGS's favor on the Title VII retaliation claim.

## IV.   <u>Conclusion</u>

For the reasons discussed above, EGS's motion for summary judgment (Dkt. 49) is denied.  The trial of this case is set for June 25, 2007.  The parties' joint pretrial order is due on June 8, 2007.

Stephen Wm Smith
United States Magistrate Judge

---

[28]      *Id.*; Harrison Aff., ¶¶ 53-54.